(C. D. 2050)

KAUFMAN & VINSON CO. *v*. UNITED STATES

United States Customs Court, Second Division

(Decided December 3, 1958)

*Siegel, Mandell & Davidson (Joshua M. Davidson* and *David Serko* of counsel) for the plaintiff.

*George Cochran Doub,* Assistant Attorney General *(Henry J. O'Neill,* trial attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: An importation of so-called "muselets," the French word for wire caps, was classified by the collector of customs as articles in chief value of metal, in paragraph 397 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 397), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802, and duty was imposed thereon at the rate of 22½ per centum ad valorem.

Plaintiff claims that the commodity should be classified as bottle caps of metal, which are provided for in paragraph 390 of said act (19 U. S. C. § 1001, par. 390), as modified by the Torquay Protocol to said general agreement, 86 Treas. Dec. 121, T. D. 52739, and properly dutiable at the rate of 12½ per centum ad valorem. Other claims are not pressed.

Since it was stipulated by adversary counsel that the merchandise is not composed of gold, molybdenum, platinum, silver, or tungsten, and that the merchandise is not colored, decorated, electroplated, embossed in color, enameled, lacquered, lithographed, or waxed, only the pertinent text of the competing provisions of the statutes is here set forth:

Paragraph 397, as modified by the General Agreement on Tariffs and Trade, *supra*:

Articles or wares not specially provided for, whether partly or wholly manufactured:

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

    Composed wholly or in chief value of iron, steel, lead, copper, brass, nickel, pewter, zinc, aluminum, or other metal (not including platinum, gold, or silver), but not plated with platinum, gold, or silver, or colored with gold lacquer:

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

        Other (except slide fasteners and parts thereof)_____ 22½% ad val.

Paragraph 390, as modified by the Torquay protocol to said general agreement, *supra*:

Bottle caps of metal, collapsible tubes, and sprinkler tops:
    Not decorated, colored, waxed, lacquered, enameled, lithographed, electroplated, or embossed in color_____ 12½% ad val.

The following illustrative exhibits were received in evidence:

Exhibit 1—the imported merchandise.

Exhibits 2 and 3—two bottles, one empty, the other filled, illustrating the use of exhibit 1.

Exhibit 4—a type of bottle cap consisting of a wire hood and metal disk.

Exhibit 5—sample such as exhibit 1 in an "unwound" condition.

Exhibit 6—a plastic bottle cork.

The only witness in the case, Robert Shaffer, president of the Robert Shaffer Corp., the ultimate consignee herein, testified on behalf of plaintiff substantially as follows: His firm is engaged in importing bottling supplies and as jobbers of domestic products. Among the items which they import are bottle caps, aluminum foil to decorate champagne bottles, natural corks from Spain, and "certain types of foil capsules for wine bottles." He described exhibit 1 as a bottle cap made of wire used to protect the champagne cork in a bottle and prevent it from popping out "due to the heavy pressure in the champagne bottle." During the past 18 years, Shaffer had become well acquainted with the use of merchandise such as exhibit 1 through visits to wineries. In describing the uses of exhibit 1, Shaffer explained that when a bottle is taken from a filling machine where it has been filled with wine under very low temperature, it is brought to a corking machine and, if a plastic cork like the one in exhibits 2 and 3 is used, it is put on by hand with a rubber mallet. Then, by means of a hook attached to a wire hood machine, the wire device is twisted over the plastic cork and the neck of the bottle so as to hold the cork very tightly in place.

The use of a plastic cork such as exhibit 6, instead of a natural cork, has gained popularity in the wine industry. By the use of a

plastic cork, it is unnecessary to have a metal disk such as appears as part of exhibit 4 which would be used if one were bottling with natural corks. This is clearly demonstrated by a physical examination of exhibits 2 and 3.

In support of its claim for classification as bottle caps of metal, plaintiff invites our attention to the following cases: *Cribari & Sons* v. *United States*, 1 Cust. Ct. 19, C. D. 6; *Nestle-Lemur Company* v. *United States*, 37 Cust. Ct. 209, C. D. 1825; *Nevin* v. *United States*, 5 Ct. Cust. Appls. 423, T. D. 34945.

In the *Cribari* case, the merchandise consisted of a so-called wire hood and disk, such as that represented by illustrative exhibit 4 herein. This is clearly indicated by the description in the opinion of the court in the *Cribari* case and by an examination of the collective exhibit 1 therein which is in the files of the court. In that case, this court held that the metal disks and wire hoods constituted entireties, the sole use of which was to hold the cork firmly in place in the neck of bottles containing champagne or sparkling wines. The court there concluded that the articles in controversy "* * * perform the function of bottle caps and are to all intents and purposes bottle caps within the meaning of said paragraph 390; * * * as alleged by the plaintiffs."

The merchandise now before us, by an advanced and improved method of corking wines, performs the same function as the articles held to be bottle caps in the *Cribari* case, and no logical reason occurs to us for making any tariff distinction between the two types of devices used in bottling wines.

While the *Nevin* and *Nestle* cases above referred to involved merchandise and issues different from that now before us, nevertheless, the court, in the *Nevin* case, made the following observation, which is cited in the *Cribari* and referred to in the *Nestle* case: "* * * Common knowledge suggests that metal bottle caps are either ornamental or used to protect and hold in place the cork of the bottle. * * *." The evidence clearly establishes that the imported commodity responds to the language of the appellate court above quoted.

The defendant relies upon the case of *I. F. Schnier & Co.* v. *United States*, 15 Cust. Ct. 294, Abstract 50588. An examination of the opinion of the court and of the exhibit in that case (which is in the files of the court) indicates that the merchandise there in controversy was similar to exhibit 4 herein without a metal disk, which latter was attached after importation. The following is quoted from the opinion in the *Schnier* case:

* * * The court was of the opinion that the most that could be said of the wire hoods is that they are parts of bottle caps, and since there is no provision for parts of bottle caps contained in paragraph 390, as amended, the instant wire hoods cannot find classification thereunder. * * *

As pointed out above, advanced methods in the bottling of wines have resulted in the use of the so-called wire hoods, represented by exhibit 1 herein, in combination with plastic stoppers which do not require the addition of a metal disk when applied to their intended use. This presents a factual distinction from the *Schnier* case, wherein the court also stated that—

\* \* \* The record showed that the wire hoods cannot be used alone because the compression exerted against the cork from within the bottle would cause the wire in the hoods to cut through the cork. To avoid this and to make the wire hoods of service in bottling champagne, a metal disk is placed between the cork and the wire hood. \* \* \*

It is obvious that, in the *Cribari* case, the court was influenced by the fact that the so-called muselets or hoods "\* \* \* perform the function of bottle caps and are to all intents and purposes bottle caps within the meaning of said paragraph 390; \* \* \*." The same is equally true of the subject merchandise.

Upon the record before us and for the reasons stated, we are of the opinion that the merchandise in controversy should be classified as bottle caps of metal, within the scope and meaning of said paragraph 390 and we so hold. The claim of plaintiff that said merchandise is properly dutiable at 12½ per centum in said paragraph, as modified, *supra*, is sustained. All other claims are overruled.

Judgment will issue accordingly.